UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


DAVID A. COULTER,

       Petitioner,

                            CASE NO. 2:06-CV-10192

  v.                          JUDGE GERALD E. ROSEN
                                  MAGISTRATE JUDGE PAUL J. KOMIVES

THOMAS K. BELL,

       Respondent.[1]

_____/


## REPORT AND RECOMMENDATION

*Table of Contents*

I.     RECOMMENDATION ................................................................ 2
II.    REPORT ...................................................................................... 2
    A.    *Procedural History* ............................................................... 2
    B.    *Factual Background Underlying Petitioner's Conviction* .............................. 4
    C.    *Procedural Default* ............................................................... 12
    D.    *Standard of Review* ............................................................... 14
    E.    *Ineffective Assistance of Counsel (Claims I & II)* ................................... 16
        1.    *Clearly Established Law* ................................................. 16
        2.    *Analysis* ................................................................ 17
            a.  Failure to Object to Introduction of Petitioner's Statements (Claim I.A) ......... 17
            b.  Failure to Object to Hearsay Testimony (Claim I.B) ........................ 20
            c.  Failure to Impeach Detective Schmitzer (Claim I.C) ........................ 21
            d.  Failure to Object to Judicial and Prosecutorial Comments (Claim II) .......... 23
    F.    *Denigration of Defense Counsel (Claim II)* ........................................ 23
        1.    *Trial Judge's Comments* .................................................. 23
            a.  Clearly Established Law .................................................. 23
            b.  Analysis ................................................................ 26
        2.    *Prosecutor's Comments* ................................................... 28
            a.  Clearly Established Law .................................................. 28
            b.  Analysis ................................................................ 29
    G.    *Sentencing (Claim III)* ........................................................... 30
    H.    *Conclusion* ...................................................................... 31
III.    NOTICE TO PARTIES REGARDING OBJECTIONS ........................................ 32

---

[1]By Order entered this date, Thomas K. Bell has been substituted for Linda Metrish as the proper respondent in this action.

I.      <u>RECOMMENDATION</u>: The Court should deny petitioner's application for the writ of habeas corpus.

II.     <u>REPORT</u>:

A.      *Procedural History*

1.      Petitioner David A. Coulter is a state prisoner, currently confined at the Cooper Street Correctional Facility in Jackson, Michigan.

2.      On January 28, 2004, petitioner was convicted of first degree child abuse, MICH. COMP. LAWS § 750.136b(2), following a jury trial in the Genesee County Circuit Court.   On February 27, 2004, he was sentenced to a term of 8-15 years' imprisonment.

3.      Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:[2]

I.      MR. COULTER'S FEDERAL AND STATE CONSTITUTIONAL RIGHTS TO THE EFFECTIVE ASSISTANCE OF COUNSEL WERE VIOLATED AND HE IS ENTITLED TO A NEW TRIAL WHERE HIS TRIAL COUNSEL FAILED TO MOVE TO SUPPRESS STATEMENTS MADE BY MR. COULTER TO THE POLICE AND THEIR AGENT AFTER HIS SIXTH AMENDMENT RIGHT TO COUNSEL WAS INVOKED BUT BEFORE COUNSEL WAS PROVIDED, FAILED TO OBJECT TO HEARSAY STATEMENTS USED AGAINST MR. COULTER IN VIOLATION OF HIS RIGHT TO CONFRONTATION, AND FAILED TO IMPEACH A KEY PROSECUTION WITNESS.

A.      MR. COULTER'S FEDERAL AND STATE CONSTITUTIONAL RIGHTS TO THE EFFECTIVE ASSISTANCE OF COUNSEL WERE VIOLATED AND HE IS ENTITLED TO A NEW TRIAL WHERE HIS TRIAL COUNSEL FAILED TO MOVE TO SUPPRESS THE APRIL 29TH INTERVIEW OF MR. COULTER BY THE POLICE AND THE APRIL 30TH INTERVIEW OF MR. COULTER BY THE FIA WORKER, WHO WAS ACTING AS AN

---

[2]Petitioner first filed a motion to remand for an evidentiary hearing on his ineffective assistance of counsel claims.  That motion was denied by the court of appeals.

AGENT OF THE POLICE AND PROSECUTOR.

B.     MR. COULTER'S FEDERAL AND STATE CONSTITUTIONAL
       RIGHTS TO THE EFFECTIVE ASSISTANCE OF COUNSEL
       WERE VIOLATED AND HE IS ENTITLED TO A NEW TRIAL
       WHERE HIS TRIAL COUNSEL FAILED TO OBJECT TO
       STATEMENTS ATTRIBUTED TO DASHEKIA COULTER, MR.
       COULTER'S WIFE, BECAUSE SUCH STATEMENTS
       VIOLATED DEFENDANT'S SIXTH AMENDMENT RIGHT TO
       CONFRONTATION.

C.     MR. COULTER'S FEDERAL AND STATE CONSTITUTIONAL
       RIGHTS TO THE EFFECTIVE ASSISTANCE OF COUNSEL
       WERE VIOLATED AND HE IS ENTITLED TO A NEW TRIAL
       WHERE HIS TRIAL COUNSEL FAILED TO IMPEACH
       DETECTIVE SCHMITZER WITH THE VIDEO OF HIS APRIL 26,
       2003 INTERVIEW OF MR. COULTER.

II.    MR. COULTER WAS DENIED HIS STATE AND FEDERAL
       CONSTITUTIONAL RIGHTS TO A FAIR AND IMPARTIAL TRIAL BY
       THE TRIAL COURT TELLING A STORY DISPARAGING OF
       CRIMINAL DEFENSE COUNSELS IN GENERAL AND BY THE
       PROSECUTOR PERSONALLY DENIGRATING MR. COULTER'S
       DEFENSE COUNSEL, THEREBY ATTACKING THE CREDIBILITY OF
       DEFENSE COUNSEL, AND THUS MR. COULTER AND HIS DEFENSE.
       ALTERNATIVELY, TRIAL COUNSEL WAS INEFFECTIVE FOR
       FAILING TO OBJECT.

III.   MR. COULTER IS ENTITLED TO RESENTENCING WHERE THE
       TRIAL COURT IMPOSED A SENTENCE THAT IS AN
       UNWARRANTED DEPARTURE FROM THE SENTENCING
       GUIDELINES RANGE.

The court of appeals found no merit to petitioner's claims, and affirmed his conviction and sentence.

*See People v. Coulter*, No. 254343, 2005 WL 1314088 (Mich. Ct. App. June 2, 2005) (per curiam).

4.     Petitioner, proceeding *pro se*, sought leave to appeal these issues to the Michigan

Supreme Court. The Supreme Court denied petitioner's application for leave to appeal in a standard

order. *See People v. Coulter*, 474 Mich. 938, 706 N.W.2d 18 (2005).

5.     Petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus

on January 12, 2006.  As grounds for the writ of habeas corpus, he raises the three claims he raised in the state courts.

6.        Respondent filed his answer on July 25, 2006.  He contends that petitioner's second claim is barred by petitioner's procedural default in the state courts, and that all of petitioner's claims are without merit.

B.        *Factual Background Underlying Petitioner's Conviction*

Because many of respondent's arguments suggest that the errors of which petitioner complains were not prejudicial in light of the evidence presented at trial, a detailed recitation of that evidence is necessary.  Petitioner was convicted of first degree child abuse in connection with the scalding injury to his step-daughter on April 26, 2003.  The evidence adduced at the six-day trial was accurately detailed in petitioner's brief on appeal in the Michigan Court of Appeals:

> The prosecution's theory was that on April 26, 2003, Mr. Coulter intentionally held his 5-year-old step-daughter, Kadesjah James, in scalding water in the bathtub of the family's apartment and that as a result Kadesjah suffered severe injuries.  The defense theory was that Kadesjah filled the tub on her own while Mr. Coulter slept and that she either fell back into the hot water attempting to exit the tub or was unable to get out as the result of seizure.
>
> Officer Janell Webb responded to a 911 call of a five year old not breathing at an apartment in Flint Township on April 26, 2003.  (T II 74, 75).  Officer Webb discovered the young girl, Kadesjah, lying on her back at the foot of a bed in a bedroom on the 2nd floor apartment.  (T II 76-77).  Kadesjah was unresponsive and staring at the ceiling.  (T II 78).  Officer Webb did not notice any injuries to her at the time.  She noticed that Kadesjah was sweating, but testified that her hair and the pants she was wearing were dry.  (T II 78, 80-81).
>
> About five minutes after Officer Webb found Kadesjah, two emergency medical technicians ("EMTs") arrived at the scene.  (T II 78).  Meanwhile, one of the neighbors in the apartment approached Officer Webb and stated that Kadesjah's step-father was in another apartment having chest pains because he was upset at what had happened.  Officer Webb advised Mr. Coulter to come back to his apartment so that the ambulance medics could treat his chest pains.  (T II 78-79).
>
> Officer Webb testified that Mr. Coulter related the following events to her: earlier that day he had driven his wife to work accompanied by their one year old son and Kadesjah; on the way home, he stopped at his mother's to see if she would

4

babysit the kids, but his mother was not home; when he and the children arrived back at the apartment, Kadesjah asked if she could take a bath; he told Kadesjah to wait to take it and he then fell asleep; he awoke to the sounds of kicking; he entered the bathroom and saw Kadesjah inside the tup with water; he believed she was having a seizure; he pulled her from the tub and took her to the neighbors for help. (T II 84-85).

Officer Webb testified that at the hospital she noticed that Kadesjah had bruising between her neck and left shoulder. (T II 92). But, the photographs Officer Webb took of Kadesjah at the hospital showed only what Officer Webb called a scratch on Kadesjah's right shoulder. (T II 95).

Officer Edward Coon had arrived at the apartment just a few minutes after Officer Webb arrived. (T II 78). Officer Coon testified that Mr. Coulter advised him that Kadesjah's buttocks appeared burnt. (T III 7-8, 41, 44). Officer Coon found that the bathtub was filled with about four to six inches of cloudy water. He saw small particles, which he believed to be skin, floating on top of the water. He checked the water and it was as warm as in a hot tub. (T III 9).

Officer Coon testified that Mr. Coulter related the recent events to him as follows: he had taken his wife to work by 4:00 p.m., accompanied by their one year old son and Kadesjah; his son was crying and agitated, so upon returning to the apartment Mr. Coulter took him into the master bedroom to lay on the bed to try to get him to calm down; Kadesjah stepped in and asked him if she could play with dolls and he told her to go ahead; Kadesjah stepped in a second time and asked if she could take a bath, and Mr. Coulter told her no, not until her grandmother got there; he must have fallen asleep in the bed with his son; he was awakened by Kadesjah kicking the sides of the bathtub; he jumped up, ran into the bathroom and he found Kadesjah laying face down in the tub, having a seizure. (T III 13-14). Mr. Coulter stated that he picked Kadesjah up and ran into the stairwell yelling for help; then he took her back into his room and put some clothes on her so no one would see her naked; he then ran back out again to seek assistance. (T III 15).

Mr. Coulter told Officer Coon that Kadesjah had had a seizure in Arkansas, where the family had recently lived. He also told Coon that Kadesjah had had four to six seizures within the last two years. (T III 14).

Mr. Coulter told Officer Coon that Kadesjah was a willful child. He gave the example that she would ask her parents for water at night, and go to the sink on her own even if they said no. (T III 17). Mr. Coulter also said that he treated Kadesjah like his own daughter and that he would never hurt Kadesjah. (T III 18).

When the EMTs, Scott Diamond and Christopher Patrello, arrived at the apartment, Dimond took Kadesjah's pulse and it was very high. (T III 52-53, 59). Kadesjah was lethargic and starting [sic] off into space. (T III 55). Dimond testified that Kadesjah's lethargy was consistent with the aftermath of a grand mal seizure. (T III 70-72).

Dimond stated that neither the police nor Mr. Coulter told him that Kadesjah had burns on her buttocks. (T III 65). Dimond testified that while Kadesjah's front was dry, her back was wet and the bed was wet. He noted that Kadesjah had bruising

on her right clavicle, some scratches on her shoulder, an old scar in the abdominal area and blistering on the tops of her feet. (T III 55-56, 67).

Dimond picked Kadesjah up and carried her to the ambulance. (T III 57). When the two were halfway down the stairs Kadesjah began screaming. (T III 57). Dimond and the other EMT, Petrello, testified that on the way to the Hospital, Kadesjah screamed "dada whooped me" or "David whooped me" and "I want my mommy," (T III 60-61, 87).

Deputy Christopher Love, a Sheriff's deputy and paramedic, arrived on the scene as EMT Dimond was placing Kadesjah into the ambulance. (T III 58). Deputy Love testified that he took Kadesjah's pulse at the wrist, touching it for about 10 seconds, and that as he felt her wrist he noticed something sticky "like the back of tape." (T III 99). He never mentioned this before the day before trial. (T III 106-107). Deputy Love did not see anything on Kadesjah's wrists. (T III 99, 105-106).

Dimond testified that Deputy Love asked him about her condition and medical history, but that Deputy Love never came near Kadesjah or examined her. (T III 58-59). Dimond also testified that on a five-year old the pulse is taken at the brachial artery located on the bicep muscle. (T III 68).

Mr. Mitchell Farber testified as an expert with regard to trauma, specifically in treating burn injuries. (T II 124-126). Kadesjah was admitted to the hospital in late April of 2003 and Dr. Farber assumed Kadesjah's primary care in mid-June 2003. (T II 126). Dr. Farber testified that Kadesjah had several areas of blistering to her lower extremities, particularly to her posterior (back) side; some of the medial (inner) areas of Kadesjah's thighs suffered blistering; the blistering extended all the way up to the mid to upper portions of her buttock region and also involved small areas of her perineum. (T II 129-130, 181). Dr. Farber testified that the hospital medical records of Kadesjah's initial treatment also indicated a burn to her nose. (T II 178-179).

Dr. Farber explained current medical burn injury terminology: a superficial injury is comparable to a sunburn, a partial thickness injury involves injury to the dermis, and a full thickness injury involves the complete destruction of the dermis. (T II 134-135). He testified that Kadesjah received upper to mid or deep partial thickness burns. (T II 136).

Dr. Farber opined that Kadesjah's burns were consistent with someone sitting in water of a depth between 1-½ to 2 inches. (T II 186). Dr. Farber testified that it would be a natural human reflexive reaction, e.g. a fight or flight type response, to try to remove oneself from scalding water. (T II 187-189).

Dr. Farber testified that apart from her burns there was no bruising or other injury to Kadesjah. (T II 186-187). Dr. Farber testified that if Kadesjah's wrists had been bound with tape at the time of her burns, it would not have taken much force for her to sustain visible injury or redness to her wrists. (T II 189-190).

After leaving the hospital on April 26th, the day of this incident, Detective Schmitzer went to the Coulter apartment taking Officer Webb and a Family Independence Agency Worker with him. (T IV 111). Detective Schmitzer testified that none of the neighbors in the apartment building reported having heard anything

out of the ordinary up until they heard Mr. Coulter run out of his apartment with Kadesjah. (T V 28). At the apartment, Detective Schmitzer questioned Mr. Coulter. The detective testified that Mr. Coulter related to him that Kadesjah had asked him if she could take a bath, Mr. Coulter had said no, Mr. Coulter then went to sleep with his son in his bedroom, he awoke to the sound of somebody either kicking or thrashing in the bathroom, and he found Kadesjah face down in the tub. (T IV 113).

Detective Schmitzer collected evidence at the apartment and took pictures. He took a picture of the bathtub, with approximately four to six inches of water in it, a photograph of a black leather belt found lying in the hallway just outside the bathroom door, and a roll of tape on the floor of Mr. Coulter's bedroom. (T IV 110-116, 128). Detective Schmitzer collected what appeared to be skin samples from both the water in the tub and the tub wall, as well as a hair tie, a wash cloth, and a bar of soap from the bottom of the tup. (T IV 118-119; T V 24-25).

Detective Schmitzer examined the sliding door panels of the tub. (T IV 118). The one nearest the faucet had been nailed and caulked into place. So a person attempting to turn on the tub's faucet from the outside would have to lean into the tub and reach around that fixed door panel to turn the faucet on. (T IV 118). Detective Schmitzer almost fell in the tub attempting to reach the faucets from the outside. (T IV 118).

Detective Schmitzer told Mr. Coulter that the evidence that he collected did not support Mr. Coulter's statements and asked Mr. Coulter to come to the police station for a formal interview. (T IV 130-131). Detective Schmitzer advised Mr. Coulter that he was not under arrest, but the detective was going to accuse him of injuring his step-daughter. He testified that Mr. Coulter waived his Miranda rights. (T IV 130-131).

During this first interview at the police station, on April 26, 2003, Mr. Coulter denied hurting his daughter. (T IV 132). Detective Schmitzer testified that he told Mr. Coulter that he had talked to his wife, Mrs. Coulter, at the hospital, and that she said that her daughter never suffered from seizures. (T IV 132). Detective Schmitzer testified that he told Mr. Coulter that the EMTs heard Kadesjah say, in the ambulance, either "dada whooped me" or "David whooped me." (T IV 132). Mr Coulter said he would never hurt his kids and that Mrs. Coulter had disciplined Kadesjah earlier. Detective Schmitzer testified that he told Mr. Coulter that at the hospital Mrs. Coulter had denied disciplining Kadesjah that day and that she had stated that there were no bruises on her child when she left for work. (T IV 132-134).

Detective Schmitzer testified that he had Mr. Coulter recount the events again: Mr. Coulter told him that he had taken his wife to work; he was tired and must have fallen asleep on the bed with his one year old son; he heard some kicking in the tub; he went to the bathroom and found Kadesjah floating face down in the water; he pulled her out; and she was having a seizure. (T IV 133). Mr. Coulter stated that he clothed Kadesjah because he did not want her naked in front of people. (T IV 133). Detective Schmitzer then confronted Mr. Coulter, saying that he had taken skin samples from the tub and that Kadesjah had not bruised herself. (T IV 134). He

testified that Mr. Coulter replied that Kadesjah's skin came off when he pulled her out of the water. (T IV 134). Detective Schmitzer then placed Mr. Coulter under arrest. (T IV 134-135).

On April 28, 2003, Mr. Coulter was arraigned in the 67th District Court. Mr. Coulter requested the appointment of counsel and District Judge Richard Hughes ordered that an attorney be appointed to represent Mr. Coulter.

On April 29, 2003, Detective Schmitzer and Sergeant Dubuc again interviewed Mr. Coulter, while he was in custody and without an attorney present or having been provided to him. (T IV 135). Detective Schmitzer testified that Mr. Coulter waived his <u>Miranda</u> rights. (T IV 135). Detective Schmitzer testified that he confronted Mr. Coulter, telling him that – "based on my training, they [the injuries] didn't add up. These were all of an abuse-type burn . . . this did not happen the way you said it did." (T IV 135). Detective Schmitzer testified that Mr. Coulter looked down and said: "I know it didn't happen the way I said it did." (T IV 135-136). Detective Schmitzer claimed that Mr. Coulter was calm when he made the statement and that he made the statement without sarcasm. Detective Schmitzer claimed that Mr. Coulter "seemed like a troubled man" and "a bit remorseful." (T IV 136). Sergeant Dubuc testified that Mr. Coulter stated, "I know it didn't". (T V 103-104). Sergeant Dubuc testified that as the detectives were preparing to leave, Mr. Coulter said: "I'm going to prison aren't I." (T IV 136).

The next day, April 30, 2003, Jana Carroll, a Children's Protective Services Worker at the Family Independence Agency, interviewed Mr. Coulter at the jail. (T III 135). Carroll testified that it was office policy to speak to the alleged perpetrator of abuse. (T III 159-160).

Prior to that April 30th interview, Carroll met with Detective Schmitzer, reviewed Mr. Coulter's statements to the Detectives, and became familiar with Detective Schmitzer's theory that David Coulter was responsible for Kadesjah's burns. (T III 133-134). She had also already talked to the prosecutor before her interview with Mr. Coulter. (T III 159). Carroll admitted that she saw the prosecutor and Detective Schmitzer on April 28, 2003, for the purpose of assisting them in trying to get a warrant for Mr. Coulter's arrest. (T III 161).

Carroll admitted that it was likely that she told Detective Schmitzer and the prosecutor, that she was going to attempt to take a statement from Mr. Coulter. (T III 160-161). Carroll admitted that she was not interviewing Mr. Coulter as an impartial fact-finding mission, but that she was looking for information that she could use to support the accusations against Mr. Coulter. (T III 161).

At the April 30th interview, Mr. Coulter recounted the events of the day of Kadesjah's injury to Carroll: he had taken his wife to work, later Kadesjah had wanted to take a bath, but he said, no, because his mother was coming to get her; Kadesjah was playing with Barbies in the bedroom while he fell asleep on the bed with his son; he was awakened by hearing the tub doors rattle; he went in the bathroom and found Kadesjah's entire body and head under water, as well as her face. (T III 135-136). Mr. Coulter stated that Kadesjah's skin was coming off in his hands when he picked her up from the tub. (T III 136-137). Kadesjah was not

breathing and she had saliva coming out of her mouth. (T III 136-137). Mr. Coulter said that he had laid her on the bed and then he did not touch her after that because he had physical problems that prevented him from picking up either Kadesjah or his one-year old son. (T III 137-138).

Carroll testified that Mr. Coulter then said that Kadesjah's head was not underwater when he found her. Carroll testified that some ten minutes earlier he had said that her head was under water. Mr. Coulter denied that saying that he was sticking to what he had said earlier. (T III 137-138).

Carroll testified that Mr. Coulter said that Kadesjah was hard headed. If he would tell her not to do something, such as not to get something out of the refrigerator, she would go and tet it anyway; or, if he told her not to take a bath, she would do it anyway. (T III 140).

Carroll asked Mr. Coulter if it concerned him that Kadesjah had wanted to bathe and he went to sleep anyway. (T III 140). She told him he should have stayed awake to insure that the children were both safe. She testified that Mr. Coulter's response was, "I'm guilty nine times out of ten for not watching the kids." (T III 140).

Carroll testified that she asked Mr. Coulter if Kadesjah referred to him as daddy or dada, and that he said that Kadesjah never calls him that. (T III 140). Carroll then told Mr. Coulter that in the video tape of Mr. Coulter's April 26, 2003 interrogation by the police he had said that Kadesjah calls him dada. Carroll testified that Mr. Coulter denied that he made that statement to the police. (T III140-141).

Carroll testified that Mr. Coulter asked her no questions regarding Kadesjah's medical condition, that he appeared to be defensive and that when Carroll would ask him a question about what happened to Kadesjah, he would say, "Ask Kadesjah." (T III 141). Carroll testified that when she asked Mr. Coulter why he was not showing emotion or concern for Kadesjah that he replied that he would not feed Carroll's ego. (T III 140-142).

Carroll also testified regarding an interview of Kadesjah done by Jill Mieloch, an interviewer at the Nathan Widner Child Advocacy Center in Bay City, on July 22, 2003. (T III 142). Mieloch questioned Kadesjah as to who she came to the interview with that day; and she indicated Ann, and explained that Ann was her foster mother. (T III 147). Mieloch then asked Kadesjah why she was not with her real mother, and Kadesjah said that she could not be with her because she got in a hot tub and got burned. Mieloch then said, "You got in?" And Kadesjah said, "I didn't do it. David did it. He's mean." (T III 147-148).

Carroll testified that Kadesjah then indicated to Mieloch that Mr. Coulter had run hot water in the tub from the faucet and that he put her in the tub and would not let her get out. (T III 148). Kadesjah said that Mr. Coulter slapped her face, and that Mr. Coulter had whooped her with a belt, stating that a belt is used to whoop. Mieloch asked Kadesjah if Mr. Coulter was a safe person and she said no. (T III 148-149).

Carroll testified that at one point Kadesjah stated that Mieloch, the interviewer, was present during the incident in the bathtub and that Mieloch

responded, "What would I have seen if I was there?" Carroll testified that Kadesjah replied, "I'm lying." (T III 150). Mieloch then asked Kadesjah if she was lying when she talked about the other incidents that happened with the bathtub, and that Kadesjah indicated no. (T III 150).

Carroll admitted that a report from a psychological consultation for Kadesjah on April 28, 2003 indicated that Kadesjah was consistently stating that she did not know how she was burned because she was not there. (T III 166). Carroll also admitted that on May 5, 2003 she had noted in a report that Kadesjah could not tell the difference between the truth and a lie. (T III 167). Carroll also noted that while Kadesjah had told her that she was burned in a hot tub she did not state that Mr. Coulter placed her in the tub. (T III 168). Kadesjah had also said nothing about her hands being taped together, nothing about being beaten with a belt and nothing about her mother being beaten. (T III 167-168).

Carroll testified that although she was aware that there had been a request that Mieloch's interview of Kadesjah be recorded, it was not recorded. (T III 174). Carroll acknowledged that she was aware of studies that indicated that even the most experienced note takers cannot possibly record everything that happens in an interview. (T III 174).

Carroll acknowledged destroying her notes regarding Mieloch's interview of Kadesjah after defense counsel had subpoenaed them and other items. (T III 175-178, 180-181). Carroll further admitted that she did not provide defense counsel with everything in the FIA file, as defense counsel had subpoenaed. She admitted that she held items back after talking with her supervisor. (T III 179-181).

Carroll acknowledged that following a show cause hearing regarding the destruction of the notes, the Court had found the FIA in contempt and levied a monetary sanction against the FIA. (T III 184). Carroll admitted that she did not comply with FIA policy regarding proper responses by FIA employees to subpoena requests for documents. (T III 183-186).

Kadesjah James testified at trial. (T IV 3). The trial court asked Kadesjah if he took her doll and he told a policeman that he did not have it whether that would be the truth or a lie. Kadesjah replied that that would be a lie and that people are supposed to tell the truth. (T IV 11). Kadesjah said she was aware that the people at the trial wanted her to tell the truth. (T IV 11-12). However, when the Court asked Kadesjah if she would promise to tell the truth and asked Kadesjah if she knew that a promise was, she stated that she did not know what a promise was. Kadesjah also admitted that she did not know what a lie was. (T IV 11-12). Kadesjah stated that she had talked to the prosecution before and that he asked her questions and she had answered those questions. (T IV 13-14).

Kadesjah testified that she was five years old, but that on her next birthday she would be nine. (T IV 14-15). Kadesjah testified that she was in the hospital because her leg and back were burned in a hot tub. When the prosecutor asked how it happened, Kadesjah said, "He – don't know." (T IV 16-17). The prosecutor then asked Kadesjah if she got in the hot tub herself, and Kadesjah said "no." The prosecutor asked Kadesjah how she got into the hot tub and Kadesjah replied, "David

putted me in there." (T IV 16-17). Kadesjah went on to say that Mr. Coulter "put me in the tub and he whooped me" and that Mr. Coulter whooped her with "a belt." (T IV 18).

Kadesjah testified that there was water in the tub when Mr. Coulter put her in the tub and that he put her legs in the tub and her arms were in the air. (T IV 18-19). Kadesjah testified that her arms were up because she didn't want to get her hands burnt. She said that she had her hands together and in response to the prosecutor's question what was keeping her hands together she replied "tape." (T IV 19). The prosecutor asked who had put tape on her hands and she said "David." Kadesjah then showed her injuries to the jury. (T IV 18-19).

Kadesjah testified that she did not remember how long she had lived at the apartment with Mr. Coulter and she did not remember where she lived before that. (T IV 21-22). When defense counsel asked Kadesjah what she remembered about the apartment she said "I don't know." (T IV 21-24).

Kadesjah testified that this was not the first time she had told someone what had happened to her. (T IV 26). Kadesjah then testified that she did not remember who was at the apartment when she was burned and she did not remember what she did before she was burned. (T IV 26). Kadesjah testified that she did not go anywhere before she was burned. Kadesjah said that her mother went to work and that her mother had driven a car to work. (T IV 27). When defense counsel asked Kadesjah if anyone went with her mother to work Kadesjah began crying and then said "no." (T IV 26-27).

Kadesjah also testified that she was not playing with any toys while her mother was at work. (T IV 28). Kadesjah also testified that "whooped" meant being hit by a belt, but she went on to testify that she did not know what it means when "someone whoops you." (T IV 28-29).

Anna Longhin, Kadesjah's foster parent, testified that Kadesjah was afraid to enter the bathroom. (T III 51-55). Longhin testified that Kadesjah was on psychotropic medications, she was often hysterical and that she would become very upset about performing tasks that were well within her capabilities. (T III 67, 71).

Longhin testified that Kadesjah had told her that "David burned me and I hate him." Longhin also testified that Kadesjah told her that she had tape on her and that when Longhin asked her who put tape on her Kadesjah said Mr. Coulter did. (T III 62-63). Longhin testified that she was instructed not to discuss Kadesjah's injuries with her. (T III 60-61). However, Longhin admitted that in response to Kadesjah's question to her, "do you know who burned me," instead of saying, "I don't know how you got burned," Longhin replied, "No I did not." Kadesjah's statement that Mr. Coulter burned her followed that exchange. (T III 76-77).

Longhin testified that she heard Kadesjah say that "David Coulter ran over my Granny Nia's hand with his car" and that "My momma will not let me lay down in the tub." (T III 81, 86).

Longhin testified that she took Kadesjah to see Mary Furlette, a psychologist, because where was concern about whether Kadesjah could testify and whether she could testify truthfully at Mr. Coulter's trial. (T V 90-91). Longhin testified that she

had no reason to dispute Ms. Furlette's note that Ms. Longhin told her in Kadesjah's presence that "her step father burned her in a tub of scalding water." (T V 92-93). Longhin also testified that she had no reason to dispute Furlette's note that in response to Longhin's comment, Kadesjah had said "David did it" and "He was hitting my momma. I didn't want my momma to get hit." (T V 93). Kadesjah also then said "David is not a good daddy. After he was hitting me, he burned me in the hot water. He turned on the hot water and then he picked me up and put me in the hot water." (T V 93). "He burnt me and whooped me and put tape on my arms." (T V 93). Longhin admitted that she had advised Furlette that Kadesjah was manipulative. (T V 94).

Dr. Terrance Campbell, an expert in the area of psychology and children's memory and suggestibility, testified that memory is fragile and much prone to suggestion and decay. (T IV 73, 79-81). He testified that studies show that if a child between the age of four and eight is given certain tasks and then is asked follow up questions about those tasks forty eight hours later, the child can answer the questions with an accuracy no better than chance. (T IV 81-83). Dr. Campbell testified that the studies show that because children want to please, they will tailor answers to repeated questioning, until they are sure that the questioner is satisfied with the answer and that the more the child repeats the answer the more that child will believe the answer to be the truth, whether or not the answer give is true. (T IV 84-85). The child is more suggestible if the person asking the questions is a respected adult figure. (T IV 83-85).

Dr. Campbell also testified that even experienced interviewers of children, without the benefit of videotaping, cannot accurately recall verbatim what their questions were to children and what the child's responses were. (T IV 89). Further, therapists can clearly influence what children think they recall from some event. (T IV 95).

Def.-Appellant's Br. on Appeal, in *People v. Coulter*, No. 254343 (Mich. Ct. App.), at 1-16.

C.      *Procedural Default*

Respondent first contends that petitioner's second claim–raising related claims of judicial and prosecutorial misconduct–are barred by petitioner's procedural default in the state courts, because petitioner failed to object to the allegedly improper comments at trial. Under the procedural default doctrine, a federal habeas court will not review a question of federal law if the state court's decision rests on a substantive or procedural state law ground that is independent of the federal question and is adequate to support the judgment. *See Coleman v. Thompson*, 501 U.S. 722, 729

(1991). However, "a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on the procedural bar." *Harris*, 489 U.S. at 263. Furthermore, "only a 'firmly established and regularly followed state practice' may be interposed by a State to prevent subsequent review . . . of a federal constitutional claim." *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991) (quoting *James v. Kentucky*, 466 U.S. 341, 348-51 (1984)); *see also*, *Calderon v. United States Dist. Ct. for the E. Dist. of Cal.*, 96 F.3d 1126, 1129 (9th Cir. 1996) (internal quotation omitted) ("For the procedural default doctrine to apply, a state rule must be clear, consistently applied, and well-established at the time of the petitioner's purported default.").

Here, even were the Court to conclude that petitioner's claims are procedurally defaulted, it is still necessary to consider the claims on the merits. Petitioner can still have his defaulted claims reviewed on the merits if he can show cause for, and prejudice attributable to, his default in the state courts. Petitioner contends that his trial counsel was ineffective for failing to object at trial to the trial judge's and prosecutor's allegedly improper comments. If petitioner's position is correct, counsel's ineffectiveness may constitute cause to excuse any procedural default. *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Murray v. Carrier*, 477 U.S. 478, 488 (1986). To demonstrate that counsel was ineffective petitioner must show that counsel's performance was deficient and that he was prejudiced thereby. Both of these questions require an inquiry into the merits of petitioner's claims. Given that the cause and prejudice inquiry merges with an analysis of the merits of petitioner's defaulted claims, it is better to simply consider the merits of these claims, even if they are defaulted. *See Jamison v. Collins*, 100 F. Supp. 2d 647, 676 (S.D. Ohio 2000); *Watkins v. Miller*, 92 F. Supp. 2d 824, 832 (S.D. Ind. 2000); *cf. Strickler v. Greene*, 527 U.S. 263, 282 (1999)

(considering merits of petitioner's habeas claims where inquiry into the merits mirrored cause and prejudice inquiry).

D.      *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996).  *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002).  "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694.  "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court

to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the

decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp.2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

E.  *Ineffective Assistance of Counsel (Claims I & II)*

Petitioner first contends that his trial counsel rendered constitutionally ineffective assistance in a number of respects. Specifically, he contends that counsel was ineffective for failing to: (1) object to the introduction of statements taken in violation of his Sixth Amendment right to counsel; (2) object to the introduction of hearsay statements of the victim's mother; (3) impeach a police witness; and (4) object to judicial and prosecutorial misconduct. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.  *Clearly Established Law*

The Sixth Amendment right to counsel and the corollary right to effective assistance of counsel protect the fundamental right to a fair trial. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense. *Id.* at 687. These two components are mixed questions of law and fact. *See id.* at 698. Further, "[t]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697. If "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.*

With respect to the performance prong of the inquiry, a strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance. *See id*. at 689; *O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). "[D]efendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted). "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. at 690. With respect to the prejudice prong, the reviewing court must determine, based on the totality of the evidence before the factfinder, "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id*. at 695.

2.    *Analysis*

a.    *Failure to Object to Introduction of Petitioner's Statements (Claim I.A)*

Petitioner first contends that counsel was ineffective for failing to object to the introduction of his statements to the police on April 29, 2003, and to Jana Carroll of the Family Independence Agency on April 30, 2003. There is no question that counsel's performance with respect to these statements was deficient under the first prong of the *Strickland* test. It is undisputed that petitioner was arraigned on April 28, 2003, at which time he requested and was granted the appointment of counsel. At this point, petitioner's Sixth Amendment right to counsel attached. *See Michigan v. Jackson*, 475 U.S. 625, 629 & n.3 (1986); *United States v. Gouveia*, 467 U.S. 180, 187 (1984). Thus, petitioner had a right to counsel at all "critical stages" of the proceedings against him, including at any post-arraignment interrogation. *See Jackson*, 475 U.S. at 630. The police were therefore prohibited from initiating an interrogation, and any waiver of counsel by petitioner was

invalid. *See id.* at 636 ("[I]f police initiate interrogation after a defendant's assertion, at an arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's right to counsel for that police interrogation is invalid."). Because petitioner had invoked his right to counsel, the interrogations initiated by the police and Carroll were improper, and thus the statements were subject to exclusion.[3] Further, there was no strategic or tactical reason for counsel to fail to challenge the admission of the statements; the statements did not help petitioner's case in any way, and nothing negative could have come from moving to suppress the statements. Thus, counsel's performance was deficient.

The Michigan Court of Appeals bypassed the deficient performance issue, concluding that in any event petitioner could not establish that he received ineffective assistance because he was not prejudiced by the introduction of the statements. The court reasoned that "[t]he prosecutor presented overwhelming evidence from which a jury could convict defendant quite apart from the testimony premised on the two interviews. Thus, defendant simply failed to demonstrate a reasonable probability that, but for counsel's error, he would not have been convicted." *Coulter*, 2005 WL 1314088, at *1, slip op. at 2. Although the prejudicial effect of the introduction of petitioner's post-arraignment statements is a close one, it cannot be said that the court of appeals's determination was unreasonable in light of the facts presented at trial.

For the most part, petitioner's statements to the police on April 29, 2003, and his statements

_____

[3]Although Carroll was not a police officer, the Sixth Amendment prohibition on initiating post-arraignment interrogation extends to interrogations by persons acting as agents of the police. Here, Carroll testified that she worked in close concert with the police throughout the case, and that her purpose in interviewing petitioner was not to find the facts as a neutral arbiter but to uncover information to support the charges against him. *See* Trial Tr., Vol. III, at 159-62. In these circumstances, Carroll was acting as an agent of the police. *See People v. Wilhelm*, 822 N.Y.S.2d 786, 792 (2006); *State v. Dixon*, 916 S.W.2d 834, 836-37 (Mo. Ct. App. 1995).

to Carroll on April 30, 2003, were duplicative of the statements he gave to the police immediately after the police arrived at the home on April 26. Petitioner gave the same basic account in each of the interviews, *i.e.*: that he took his wife to work, then went to see if his mother could baby sit Kadesjah, then returned home where Kadesjah asked if she could take a bath; that he fell asleep, and awoke to the sounds of kicking, entered the bathroom, and saw Kadesjah face down in the tub. *Compare* Trial Tr., Vol. II, at 84-85 (testimony of Officer Webb concerning petitioner's statements to him at the scene on April 26) *and id*., Vol. III, at 13-15 (testimony of Officer Coon concerning petitioner's statements to him at the scene), *and id*., Vol. IV, at 113, 131-35 (testimony of Detective Schmitzer regarding petitioner's statements to him later on the same day), *with id*., Vol. III, at 135-36 (testimony of Carroll regarding her interview of petitioner). The only truly prejudicial information reflected in the post-arraignment interviews was petitioner's statement, given in response to Detective Schmitzer's comment that the physical evidence did not support petitioner's version, that he "kn[e]w it didn't happen the way I said it did." Trial Tr., Vol. IV, at 135-36; *see also*, *id*. at 103-04.

While this was a significant piece of incriminating evidence which contradicted his other statements, in which he denied any wrongdoing, it was nevertheless significantly outweighed by the other evidence at trial. First, it was apparent from the physical evidence alone that "it didn't happen the way [petitioner] said it did." Most notably petitioner's version, in which Kadesjah had entered the tub on her own and was found by him floating face-down, was belied by the fact that Kadesjah's burn injuries were confined to her back, not her front, and by the medical testimony that a child of Kadesjah's age would have removed herself from the scalding water. On top of this evidence which went specifically to the implausibility of petitioner's version of events, there was significant

additional evidence of petitioner's guilt. Kadesjah repeatedly stated that she had been held down in the tub by petitioner to the police and EMS personnel, and repeated this testimony at trial. Kadesjah's burn injuries supported her testimony, as did physical evidence that her hands had been taped together. In light of this evidence, it cannot be said that the Michigan Court of Appeals's determination that the result of the proceeding would not have been different had counsel moved to suppress petitioner's post-arraignment statements was unreasonable as required for habeas relief to be available under § 2254(d)(1). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief with respect to this claim.

### b. Failure to Object to Hearsay Testimony (Claim I.B)

Petitioner next argues that counsel was ineffective for failing to object to hearsay testimony regarding statements made by his wife to Detective Schmitzer. During direct examination, the prosecutor asked Detective Schmitzer to recount the interview he had with petitioner at the police station on April 26. Detective Schmitzer testified that he questioned petitioner on several inconsistencies between his version of the events and the evidence. In particular, Detective Schmitzer testified that "he had said something about seizures at the apartment, but I had talked to Mrs. Coulter at the hospital, and she said that her daughter never suffered from seizures. I confronted him on the seizure issue[.]" Trial Tr., Vol. IV, at 132. Similarly, Detective Schmitzer testified that he challenged petitioner's statement that Mrs. Coulter had disciplined Kadesjah earlier in the day, which could explain the bruises on Kadesjah by telling him that Mrs. Coulter had denied doing so. *See id.* Petitioner contends that this testimony was impermissible hearsay which violated his Sixth Amendment right to confront the witnesses against him, and that counsel therefore should have objected to this testimony.

Again, the Michigan Court of Appeals determined that the introduction of this testimony, even if improper, did not prejudice petitioner in light of the significant evidence of petitioner's guilt. *See Coulter*, 2005 WL 1314088, at *2, slip op. at 2.[4] Detective Schmitzer's testimony was not deliberately elicited by the prosecution, but followed a general question from the prosecutor regarding the circumstances of the interview. The testimony was not highlighted or emphasized in any way. Against this brief testimony in a several day trial, the prosecution presented significant evidence of petitioner's guilt, including the testimony of the victim and the police officers and EMS technicians who responded to the scene, the physical evidence of the victim's injuries, and the medical testimony that petitioner's version of events was implausible in light of the physical evidence. In light of this evidence and the brief, unsolicited nature of Detective Schmitzer's testimony regarding Mrs. Coulter's statements, the court of appeals's determination that petitioner was not prejudiced by the introduction of this testimony was reasonable. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### c. Failure to Impeach Detective Schmitzer (Claim I.C)

Petitioner next contends that his counsel was ineffective for failing to play the entire videotape of his interview with Detective Schmitzer in order to impeach Detective Schmitzer's

---

[4]Alternatively, the court of appeals concluded that the statements were not hearsay because they were not offered to prove the truth of the matter asserted, *see* MICH. R. EVID. 801(c), but rather were used by Detective Schmitzer "to show *why* he confronted defendant, not to prove the matters asserted." *Coulter*, 2005 WL 1314088, at *2 n.2, slip op. at 2 n.2. If, indeed, the testimony did not constitute hearsay under Rule 801(c), then the introduction of Mrs. Coulter's statements raised no confrontation concerns, and counsel's performance was not deficient. *See Crawford v. Washington*, 541 U.S. 36, 59 n.9 (2004) (citing *Tennessee v. Street*, 471 U.S. 409, 414 (1985)) ("The Clause . . . does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."). Because petitioner cannot establish prejudice, the Court need not decide whether the Michigan Court of Appeals correctly concluded that Mrs. Coulter's statements were not offered for the truth of the matter asserted.

testimony regarding that interview. A video of the April 26 interview at the police station was recorded, but only about one minute of the video was played for the jury during Detective Schmitzer's testimony. *See* Trial Tr., Vol. V, at 35-36. Petitioner contends that counsel was ineffective for failing to show the jury the entire video, which would have impeached Detective Schmitzer's testimony. Specifically, petitioner claims that the video tape would have contradicted Schmitzer's testimony regarding the seizures, because the video shows that Schmitzer did not mention seizures at all, only that he had interviewed Mrs. Coulter. Petitioner also claims that, contrary to Detective Schmitzer's testimony that petitioner told him that Kadesjah's skin had come off only after Schmitzer told petitioner that he had taken skin samples from the tub, the video shows that petitioner mentioned Kadesjah's skin coming off before Schmitzer told him about the skin samples.

At the outset, petitioner's argument that there is no reasonable basis for counsel to have failed to impeach Detective Schmitzer with the videotape is without merit. While the actual reasons for counsel's omission are not apparent from the record, counsel reasonably could have concluded that showing the entire video would have increased the jury's focus on petitioner's implausible version of events and provided additional inculpatory information. Counsel could have determined that it was better to attack Schmitzer's testimony through rigorous cross-examination, which he conducted, rather than have the jury focus on the substance of the interview. This issue aside, however, the Michigan Court of Appeals's determination that petitioner was not prejudiced by counsel's omission, *see Coulter*, 2005 WL 1314088, at *2, slip op. at 3, was reasonable. Petitioner does not challenge the accuracy of Schmitzer's testimony regarding the substance of petitioner's statements to him, only two particulars which did not go to the heart of the case. In particular, who

first mentioned Kadesjah's skin falling off was irrelevant to the issue of whether Kadesjah got into the tub herself or was placed in the tub by petitioner. Further, while the seizure issue was somewhat relevant in light of petitioner's defense, as explained above any error with regard to the seizure issue was not prejudicial in light of the overwhelming evidence of petitioner's guilt presented to the jury. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### d. Failure to Object to Judicial and Prosecutorial Comments (Claim II)

Finally, petitioner contends that his trial counsel was ineffective for failing to object to the prejudicial comments of the trial judge and prosecutor. As explained in part F, *infra*, neither the prosecutor's nor the judge's comments were improper. Thus, any objection would have been meritless, and counsel cannot be deemed ineffective for failing to raise a meritless objection. *See Anderson v. Goeke*, 44 F.3d 675, 680 (8th Cir. 1995); *Burnett v. Collins*, 982 F.2d 922, 929 (5th Cir. 1993).

### F. Denigration of Defense Counsel (Claim II)

Petitioner next claims that he was denied a fair trial by the comments of the trial judge and prosecutor which disparaged his counsel. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

#### 1. Trial Judge's Comments

##### a. Clearly Established Law

Perhaps "[n]o right is more fundamental to the notion of a fair trial than the right to an impartial judge." *Bracy v. Gramley*, 81 F.3d 684, 696 (7th Cir. 1996) (Rovner, J., dissenting), *rev'd*, 520 U.S. 899 (1997); *see also*, MASS. CONST. of 1780, pt. 1, art. 29. Thus, "the Due Process Clause clearly requires a 'fair trial in a fair tribunal,' before a judge with no actual bias against the

defendant or interest in the outcome of his particular case." *Bracy*, 520 U.S. at 904-05 (citation omitted) (quoting *Withrow v. Larkin*, 421 U.S. 35, 46 (1975)). "Because judicial bias infects the entire trial process it is not subject to harmless error review." *Maurino v. Johnson*, 210 F.3d 638, 645 (6th Cir. 2000) (citing *Chapman v. California*, 386 U.S. 18, 23 & n. 8 (1966)); *see also*, *Rose v. Clark*, 478 U.S. 570, 577 (1986) (citing *Tumey v. Ohio*, 273 U.S. 510 (1927)).

Habeas relief on the basis of judicial bias is appropriate only if "the state trial judge's behavior rendered the trial so fundamentally unfair as to violate federal due process under the United States Constitution." *Duckett v. Godinez*, 67 F.3d 734, 740 (9th Cir. 1995). As a general matter, habeas relief will be appropriate only upon a showing that the trial judge was actually biased or prejudiced against the petitioner. *See Fero v. Kerby*, 39 F.3d 1462, 1478 (10th Cir. 1994). However, in exceptional circumstances "the likelihood of bias or appearance of bias can, in certain circumstances, be so substantial as to create a conclusive presumption of actual bias." *Id*. (internal quotation omitted). The appearance of bias situation is limited to cases in which "a judge is faced with circumstances that present some actual incentive to find one way or the other[,]" *id*. (internal quotation omitted); *see also*, *Del Vecchio v. Illinois Dep't of Corrections*, 31 F.3d 1363, 1372 (7th Cir. 1994) (en banc), such as where the judge has a pecuniary interest in the outcome or has been the target of repeated abuse by one of the parties. *See Six v. Delo*, 885 F. Supp. 1265, 1271 (E.D. Mo. 1995), *aff'd*, 94 F.3d 469, 478 (8th Cir. 1996).

As the Supreme Court has noted in the context of the federal recusal statute, "[t]he alleged bias and prejudice to be disqualifying must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case." *United States v. Grinnell Corp.*, 384 U.S. 563, 583 (1966); *see also*, *Liteky v. United States*,

510 U.S. 540, 549-51 (1994); *Browning v. Foltz*, 837 F.2d 276, 279 (6th Cir. 1988).  For this reason,

> judicial rulings alone almost never constitute a valid basis for a bias or partiality motion.  In and of themselves (i.e., apart from surrounding comments or accompanying opinion), they cannot possibly show reliance upon an extrajudicial source; and can only in the rarest circumstances evidence the degree of favoritism or antagonism required . . . when no extrajudicial source is involved.

*Liteky*, 510 U.S. at 555.  Thus, "[a] judge's ordinary efforts at courtroom administration–even a stern and short-tempered judge's ordinary efforts at courtroom administration–remain immune." *Id.* at 556.  Although *Liteky* was decided on the basis of the federal recusal statute, it provides guidance for resolving habeas claims of judicial bias.  *See Maurino*, 210 F.3d at 645; *Poland v. Stewart*, 117 F.3d 1094, 1103-04 (9th Cir. 1997).

Apart from judicial comments which show bias, a judge's comments will provide a ground for habeas relief only if the comments deprived the petitioner of a fair trial.  Unlike an appellate court on direct appeal, a federal habeas court does not exercise supervisory powers over the state courts, *see Murphy v. Florida*, 421 U.S. 794, 797 (1975), and thus a federal court's habeas jurisdiction is limited to correcting violations of federal constitutional law; it does not have the authority to correct perceived injustices absent a constitutional violation.  *See Guinan v. United States*, 6 F.3d 468, 470-71 (7th Cir. 1993); 28 U.S.C. § 2254(a) (emphasis added) (federal court has jurisdiction to entertain petition brought by state prisoner "*only* on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.").[5]

As the Sixth Circuit has explained:

---

[5]In contrast, a federal court may use its supervisory powers over lower federal courts and federal prosecutors to correct injustices.  *See United States v. Leslie*, 783 F.2d 541, 569-70 (5th Cir. 1986) (en banc) (Williams, J., dissenting), *vacated*, 479 U.S. 1074 (1987); *United States v. Crawford*, 466 F.2d 1155, 1157 (10th Cir. 1972).

Unless they amount to constitutional violations, prejudicial comments and conduct by a judge in a criminal trial are not proper subjects for collateral attack on a conviction. In collateral proceedings, the test is whether the errors alleged could have rendered the trial fundamentally unfair. To violate a defendant's right to a fair trial, a trial judge's intervention in the conduct of a criminal trial would have to reach a significant extent and be adverse to the defendant to a substantial degree.

*McBee v. Grant*, 763 F.2d 811, 818 (6th Cir. 1985) (internal quotations, citations, and alterations omitted). Or as the Ninth Circuit has explained, on habeas review "the question is not simply whether the trial judge committed misconduct or whether [a federal appellate court] would reverse a conviction obtained after a trial in which a federal judge behaved in the same manner. Rather, we must ask whether the state trial judge's behavior rendered the trial so fundamentally unfair as to violate federal due process under the United States Constitution." *Duckett v. Godinez*, 67 F.3d 734, 740 (9th Cir. 1995); *accord Harrington v. Iowa*, 109 F.3d 1275, 1280 (8th Cir. 1997). In other words, to warrant habeas relief "there must be an 'extremely high level of interference' by the trial judge which creates 'a pervasive climate of partiality and unfairness.'" *Duckett*, 67 F.3d at 740 (quoting *United States v. DeLuca*, 692 F.2d 1277, 1282 (9th Cir. 1982)).

*b. Analysis*

Throughout the trial, when there were breaks in the testimony, the trial judge told the jury historical or legal anecdotes. *See* Trial Tr., Vol. II, at 117-19 (explaining to jury significance of mural in the courtroom depicting the history of Genesee County); Vol. V, at 49-51 (explaining significance of constitutional rights to confront one's accusers and to be present to assist counsel by reference to a story of the trial of William Penn in which he was excluded from the courtroom for wearing a hat which one of the judges had asked him to put on). Following the testimony of Dr. Campbell, the trial judge told the anecdote which forms the basis of petitioner's habeas claim:

Once upon a time there was a murder trial, and it was in Chicago. A woman

was accused of killing her husband with poison; and, in the closing argument, the defense lawyer gave all the reasons why she couldn't possibly have done that; and then he wrapped things up by going up to the evidence table and grabbing the bottle poison, opening it up, gulp, gulp, gulp. Put it down and said, ladies and gentleman, it's not poison. The jury went out and deliberated, came back in about two-and-a-half minutes with a not guilty verdict. Two minutes after that, he was seen going out the back door of the courthouse and awaiting a cab on the way to the hospital where he had his stomach pumped.

Trial Tr., Vol. IV, at 103. The Michigan Court of Appeals rejected petitioner's claim that this anecdote denied him a fair trial, explaining that the judge told a number of stories during breaks, that the court did not express any feelings of ill will toward defense counsel, and that the anecdote did not express any antagonism toward petitioner or his counsel. The court of appeals also noted that the trial judge instructed the jury that his stories should not be considered as evidence. *See Coulter*, 2005 WL 1314088, at *3, slip op. at 3. The Court should conclude that this determination was reasonable.

Here, there is no evidence that the trial court was biased against petitioner or his attorney. At no point during the trial did the judge disparage petitioner, suggest that his defense was incredible, or otherwise intimate any view on the merits of the case. As the Supreme Court has explained, "judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel . . . ordinarily do not support a bias or partiality challenge." *Liteky*, 510 U.S. at 555. Nor does the record reflect any personal animus toward petitioner himself or any bias on the part of the judge in favor of the prosecution. The judge's story, regardless of their propriety, do not of themselves give rise to an appearance of partiality and do not establish that he was actually biased against petitioner, and it cannot be said that the Michigan Court of Appeals's determination to the contrary was an unreasonable application of clearly established law. *See Jones v. Luebbers*, 359 F.3d 1005, 1014-15 (8th Cir. 2004); *Allen v. Hawley*, 74 Fed. Appx. 457, 460-61 (6th Cir. 2003);

*Copeland v. Walker*, 258 F. Supp. 2d 105, 136-37 (E.D.N.Y. 2003). Thus, petitioner cannot show that the judge was biased against him.

Nor can petitioner show that the story told by the trial judge denied him a fair trial. The story was nothing more than an amusing anecdote about a trial wholly unrelated to the case before the jury. The trial judge did not preface or conclude the story with any comments suggesting that the story reflected on the nature of defense attorneys in general or petitioner's attorney in particular. The comments were not "substantially adverse to the defendant himself," and "[t]here is no showing that the trial judge ever intimated [her] opinion on the merits of the case." *Todd v. Stegal*, 40 Fed. Appx. 25, 27 (6th Cir. 2002). In these circumstances, petitioner cannot show that he was denied a fair trial by the trial judge's story. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

2. *Prosecutor's Comments*

Petitioner also contends that he was denied a fair trial by comments of the prosecutor which suggested that his attorney had made up facts and evidence. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

*a. Clearly Established Law*

For habeas relief to be warranted on the basis of prosecutorial misconduct, it is not enough that the prosecutor's conduct was "undesirable or even universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). Rather, the misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* (internal quotation omitted). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). In determining whether the

prosecutor's conduct was so egregious as to warrant habeas relief, a court should consider "the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury; and the strength of the competent proof to establish the guilt of the accused." *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (internal quotations and citations omitted). In sum, to constitute a denial of due process the prosecutor's conduct must be "so pronounced and persistent that it permeates the entire atmosphere of the trial." *Id*. (internal quotation omitted).

*b. Analysis*

During closing argument, the prosecutor attacked defense counsel's attempt to explain the inconsistencies between petitioner's various statements to the police and the injuries received by the victim. For example, in reference to petitioner's statement to the police that he found the victim lying face down in the water, the prosecutor argued:

> Now the defense attorney, throughout this trial, has tried and tried and tried to change that, to change that fact, to say well maybe there was a misunderstanding, maybe they didn't let him finish, maybe you didn't follow up and ask the right questions; maybe he really said this. No, no, unh unh. We've got you. We've got the goods on you. We've got the got–goods on you, Mr. Defendant. Your attorney can't – can't change the facts.

Trial Tr., Vol. V, at 139-40. Later, the prosecutor argued that defense counsel "blamed everyone else conceivable. Pointed the finger everywhere else possible except at [petitioner]." *Id*. at 151-52. Finally, in response to counsel's argument that the victim must have been face down in the tub because her nose was burnt, the prosecutor argued: "Well, it turns out, Dr. Farber says her nose wasn't burnt. He's relying on some triage nurse in some medical record to say that, you know, her nose was burnt. Her nose wasn't burnt. That's the rest of the story. And then when the – he can't even glum [sic] onto facts, then he just then they're just made up." *Id*. at 156-57.

Taken in context, these comments were not improper. A prosecutor's comment is not improper to the extent it is a permissible characterization based on the evidence admitted at trial. *See, e.g.*, *Nichols v. Scott*, 69 F.3d 1255, 1283 (5th Cir. 1995) (comment "is permissible to the extent that it draws a conclusion based solely on the evidence presented.") (internal quotation omitted); *United States v. Grey Bear*, 883 F.2d 1382, 1392 (8th Cir. 1989); *Martin v. Foltz*, 773 F.2d 711, 717 (6th Cir. 1985) (prosecutor may argue permissible inferences from the evidence). Here, the prosecutor's comments were merely argument as to why the version of events put forth by petitioner and his counsel was not credible in light of the physical and other evidence, and that the facts as shown by the evidence were what they were regardless of counsel's attempts to show otherwise. As the Sixth Circuit has noted, "[a] prosecutor commenting that the defense is attempting to trick the jury is a permissible means of arguing so long as those comments are not overly excessive or do not impair the search for truth." *United States v. August*, 984 F.2d 705, 715 (6th Cir. 1992). Thus, the prosecutor's comments that the defense presented was based on counsel's attempt to change the facts did not deprive petitioner of a fair trial. *See August*, 984 F.2d at 714-15 (on direct review of federal conviction, prosecutor's comment that defense counsel was trying to trick the jury did not rise to the level of prosecutorial misconduct); *Lindgren v. Lane*, 925 F.2d 198, 204 (7th Cir. 1991) (prosecutor's comments that defense theory was rife with inconsistencies, that defense counsel pulled "these inconsistencies like a magician pulls rabbits out of his hats," and that defense counsel was trying to "trick" the jury with "illusions" were not so egregious as to warrant habeas relief). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

G.     *Sentencing (Claim III)*

Finally, petitioner contends that the court improperly departed from the Michigan sentencing guidelines in imposing sentence. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

Generally, a habeas petitioner's claim that the trial court violated state law when sentencing him is not cognizable in habeas corpus proceedings. *See Branan v. Booth*, 861 F.2d 1507, 1508 (11th Cir. 1988); *Haynes v. Butler*, 825 F.2d 921, 924 (5th Cir. 1987). Federal habeas courts have no authority to interfere with perceived errors in state law unless the petitioner is denied fundamental fairness in the trial process. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Serra v. Michigan Dep't of Corrections*, 4 F.3d 1348, 1354 (6th Cir. 1993). Thus, petitioner is entitled to relief on his sentencing claims only if he was denied fundamental fairness, or if his sentence violates some specific constitutional guarantee. Petitioner does not raise any constitutional challenge to his sentence; rather, he claims only that the trial court's upward departure was improper as a matter of state sentencing law. A claim that the trial court improperly departed above the guidelines range raises an issue of state law not cognizable on habeas review. *See Cook v. Stegall*, 56 F. Supp. 2d 788, 797 (E.D. Mich. 1999) (Gadola, J.) (claim that sentencing court departed from Michigan sentencing guidelines presents an issue of state law only and is, thus, not cognizable in federal habeas review); *Welch v. Burke*, 49 F. Supp. 2d 992, 1009 (E.D. Mich. 1999) (Cleland, J.) (same); *see also*, *Branan*, 851 F.2d at 1508 (claim that court misapplied state sentencing guidelines not cognizable on habeas review). Accordingly, the Court should conclude that petitioner is not entitled to relief on this claim.

H.       *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of

petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law. Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.

III.    NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/Paul J. Komives                           
PAUL J. KOMIVES
UNITED STATES MAGISTRATE JUDGE

Dated: 5/12/08

The undersigned certifies that a copy of the foregoing order was served on the attorneys of record by electronic means or U.S. Mail on May 12, 2008.

s/Eddrey Butts
Case Manager